# EXHIBIT 2

## SCOTT ROVNER DEPOSITION TRANSCRIPT

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
CIVIL No. 1:23-cv-01365-LKG

JACOB YODER, et al.,          )
                              )
        Plaintiffs,           )
                              )       DEPOSITION UPON
   vs.                        )
                              )   ORAL EXAMINATION
CONAWAY RACING &              )
TRUCKING, LLC, et al.,        )             OF
                              )
        Defendants.           )       SCOTT ROVNER
-----------------

TRANSCRIPT OF DEPOSITION, taken by and
before, TARA L. KENNY, Professional Reporter and
Notary Public, taken via Zoom/Virtual means, on
Friday, November 7, 2025, commencing at 9:04 a.m.

MAGNA LEGAL SERVICES
(866) 624-6221
www.MagnaSL.com



Page 2

APPEARANCES:

FURMAN HONICK LAW
BY: ALLEN E. HONICK, ESQUIRE
    allen@fhjustice.com
11155 Red Run Boulevard
Suite 110
Owings Mills, Maryland 21117
Counsel for the Plaintiffs


KIERNAN TREBACH, LLP
BY: KATHERINE B. YODER, ESQUIRE
    kyoder@kiernantrebach.com
1233 20th Street
8th Floor
Washington, D.C., 20036
Counsel for the Defendant,
Builders First Source, Inc.

DECARO, DORAN, SICILIANO,
GALLAGHER & DEBLASIS, LLP
BY: JAMES S. LISKOW, ESQUIRE
    jliskow@dcarodoran.com
17251 Melford Boulevard
Suite 200
Bowie, Maryland 20715
Counsel for the Defendant,
Aaron Pacheco

PESSIN KATZ LAW, P.A.
BY: HALLE P. GRAY, ESQUIRE
    hgray@pklaw.com
5950 Symphony Woods Road
Suite 510
Columbia, Maryland 21044

ALSO PRESENT:

Jessica Choate, Esquire

Page 3

INDEX

WITNESS                    PAGE

SCOTT ROVNER            NO.

    By: MS. YODER        4

    By: MR. HONICK       19


          - - -
      EXHIBITS

                PAGE
NUMBER      DESCRIPTION      MARKED
Exhibit-1   BFS0143      26
Rovner-1    JSB119       30
Rovner-2    JSB207       30
Rovner-3    JSB214       30

Page 4

SCOTT ROVNER, after having been
duly sworn, was examined and testified as
follows:

EXAMINATION

BY MS. YODER:

Q.    Hi, Mr. Rovner. My name is Kate Yoder. You and I have spoken. First of all, I want to thank you for being here today.

So if you could please state your name for the record?

A.    Scott Rovner.

Q.    And your current address or your business address?

A.    7178 Marshall Road, Upper Darby, Pennsylvania 19082.

Q.    Have you ever had your deposition taken before?

A.    A long time ago, yes.

Q.    Okay. I'm going to go over -- I don't

Page 5

expect us to be here very long at all, but I'm going to go over a few rules of the road to make this as easy as possible; and, also, so that we don't drive the court reporter crazy. It's very important that you verbalize your answers, because if you shake your head or you say "uh-huh" or "uh-uh," it's unclear what your answer is. So try to articulate and give an actual word answer.

A.    Yes.

Q.    There you go. You passed the first test.

This can be a little conversational, so it's important that -- you may know the question I'm going to ask you, but let me finish the question; and I'll try to do the same when you're giving an answer so that we have a clear record.

A.    That's fine.

Q.    Okay. Believe it or not, sometimes attorneys ask poorly phrased questions. If you don't understand what I'm asking, please let me know and I will rephrase it. Okay?

A.    Correct. Okay. No problem.

Q.    If you need a break at any time, let me know.

All right. What is your date of birth?



Page 6

A.    7/1/1954.
Q.    Where do you currently work?
A.    At Rovner Insurance.
Q.    What is your position there?
A.    I own it.
Q.    Is this -- oh, and how long have you had Rovner Insurance?
A.    Over 40-something years.
Q.    Is this the same job or the same business that you owned in August of 2020?
A.    Yes.
Q.    What did you do to prepare for this deposition?
A.    Well, I got all the records out.  I discussed it with you several times, and that's about it.
Q.    Okay.  Did you review any documents other than what you provided to me and then all of us?
A.    No.
Q.    Are you aware of a Certificate of Insurance for auto coverage that was issued by your company for Conaway on August 28, 2020?
A.    Yes, I'm aware of this.
Q.    Do you know how your company, Rovner, came

Page 7

to be involved in this transaction?
A.    I don't understand the question.
Q.    Do you know how Rovner was first contacted to provide this coverage for Conaway?
        MR. HONICK:  Objection.  This is beyond the scope, Kate.  Are you speaking about the document or coverage in general?
        MS. YODER:  Just -- I'm laying the foundation for the fact that they ultimately issued this COI.  So I'm going back to how that contact started.  That's within the context of the scope of this deposition.
BY MS. YODER:
Q.    So, Mr. Rovner, my question really was, do you know how Rovner was first contacted about this?
A.    About starting the policy or doing the Certificate of Insurance?  I don't understand.
Q.    Doing this specific Certificate of Insurance that was for auto coverage for Conaway in August of 2020.
A.    It was an e-mail.
Q.    Okay.  Do you know who the e-mail was from?
A.    Patrick Montgomery.
Q.    And what was the substance of that e-mail,

Page 8

if you know?
A.    Well, yeah, he asked us -- which is normal business -- to supply a cert of verifying coverage, which we did, and we sent it to him.
Q.    And do you have any understanding as to whether there was also a GL and a work comp policy being issued by Braddock?
A.    I knew they had other insurance.  I wasn't specifically sure of all the coverages they had, but I knew they had other insurance.
Q.    And is that a typical situation, or is it unusual to have different policies from different producers?
A.    Oh, all the time.  Sure.
Q.    So it's typical?
A.    Yes.
Q.    Okay.
A.    The agents don't like it, but it happens.
Q.    Okay.  Because it makes it -- it's shuffling a lot of different paperwork with different people?
A.    Well, that, plus they want the commission on everything.  So it's nice to have everything.  You don't like other agents sniffing around your clients.

Page 9

Q.    Okay.  All right.  I'm going to show you a document that was in the document production that Braddock Insurance produced to us.  I believe you're going to be familiar with everything I show you.  And, hopefully, I can get share screen to work.
        Mr. Rovner, are you able to see this document?
A.    It's an e-mail, yes.
Q.    Yes.  Okay.  This was Bates stamped JSB119.  This came from Braddock.  It's going to be a three-page document that was an e-mail and then a COI.
        Can you tell me a little bit about this?  The last two in this line of -- chain of e-mails, the last two are from August.  So are these the e-mails that you were talking about, where Mr. Montgomery e-mailed your agency to ask for a cert?
A.    Yes.
Q.    Okay.  And then is the top e-mail from Kim Dougherty -- is she with Rovner?
A.    Not anymore.
Q.    Okay.  What was her position at the time when she was with you?
A.    She was a customer service rep.


MAGNA
LEGAL SERVICES

Page 10

Q.    Okay. And so in this e-mail, would you agree with me that she's attaching a COI that's to go to Conaway; correct?

A.    Yes, I agree.

Q.    And so then moving on down to the document that was attached, can you explain what this document is?

A.    The certificate from Progressive, is that where --

Q.    Yeah.

A.    You're moving it, so I want to make sure.

Q.    Sorry.

A.    Yeah, that's just a Certificate of Insurance, which certifies they have insurance. And it goes through the coverages, their location and what -- I think the rest of it shows what vehicles are covered.

Q.    Okay. And it's just a two-page document; right?

A.    This looks like one, yeah.

Q.    Okay.

MR. HONICK: Kate, what Bates number is that on there? I don't see that corresponding with the Bates numbers on the

Page 11

Braddock production.

MS. YODER: So we talked to Chris Block this week. There are hyperlinks in what he produced. I figured everybody else had figured it out, but he -- and he can explain it during the Braddock deposition. But the way his paralegal forwarded it, if you see this hyperlink up here on the first page, if you click on that, the attachments are behind it. But his paralegal did not Bates stamp the attachments.

MR. HONICK: All I'm asking, Kate, is I see on that first e-mail it says JSB0-something, 119. That's beyond -- I mean our Braddock Bates go to 110.

MS. YODER: He did a supplemental production that you were included on, that we provided to everybody.

MR. HONICK: Okay. So that's -- These are the individual e-mails that he sent like 30 of them?

MS. YODER: Yeah.

MR. HONICK: Okay. Sorry. Thanks for the clarity.

Page 12

BY MS. YODER:

Q.    Okay. So, Mr. Rovner, does this Certificate of Insurance, does this demonstrate that Mr. Conaway had insurance as of the date listed on this COI?

MR. HONICK: Objection, Kate. Now we're beyond the scope.

BY MS. YODER:

Q.    You can answer the question.

MR. HONICK: You can answer, Mr. Rovner.

THE WITNESS: Oh, okay. Yes. Can I ask you guys who everyone represents? Am I allowed to know that?

BY MS. YODER:

Q.    Sure. So, Mr. Rovner, you know I represent the BFS Defendant, who ultimately were in -- were working with Conaway in shipping. Mr. Honick, who I don't know if you know or not, he's the Plaintiff's lawyer. And Hallie Gray, she is counsel for Mr. Conaway. And then Mr. Liskow is counsel for Mr. Pacheco, who worked for Conaway.

A.    Okay.

Q.    I know, we don't have to do that at the beginning. We always should have to do that for a

Page 13

deposition.

All right. I am going to show you another document. Okay. Mr. Rovner, this is a document that was Bates stamped JSB207. It's an e-mail that we'll take a look at, that kind of follows up the prior e-mail. And then it has two -- it has just one COI attached to it.

So can you kind of walk me through the correspondence here?

A.    Well, yeah, he's saying that Builders First wanted an ACORD cert instead of the form that Progressive sent out. So ACORDs are kind of the universal insurance forms. And so that's the revised or the change -- the ACORD cert that was sent from Kimmy.

Q.    And that was sent from your employee, Kim, to Mr. Montgomery; correct?

A.    Yes.

Q.    Okay. And can you tell me what this -- the attached document is?

A.    This is the cert that we sent him to send to his client or First -- usually, I would just go right to the -- to the cert holder. They need a copy of it.

Page 14

Q. But in this instance, it was sent directly to Mr. Conaway; correct?

A. No. It was sent to Montgomery, who then --

Q. Right.

A. We assumed --

Q. Sorry.

A. Yeah. We assumed it was going to go to, First, whatever, or Conaway. It can go to both. It can go to anybody. It's not like top secret.

Q. Okay. But in this instance, it was sent to Patrick Montgomery at Braddock?

A. Correct.

Q. Okay. And, again, this form demonstrates that Mr. Conaway had insurance as of the date listed on the COI; correct?

MR. HONICK: Objection.

You can answer, Mr. Rovner.

THE WITNESS: Correct.

BY MS. YODER:

Q. Do you have any knowledge of what happened with this ACORD form COI after Kim from your office sent it to Mr. Montgomery?

A. I did not know until I got the subpoena what happened to it.

Page 15

Q. Okay. I'm showing you what was Bates stamp JSB214, which is an e-mail correspondence -- which we'll go back to -- and attached are our two COIs -- ACORD form COIs.

Can you first explain what this correspondence is, if you know?

A. It just looks like to me he's just sending copies of the search to -- I don't know where he sent him. I'm trying to --

Q. And I'll represent to you that it's going from Patrick Montgomery to a Pat, which, you know, is -- based on non-archived correspondence that we've seen is Patrick Conaway.

A. Okay. Yeah. Then -- yeah, and that would be normal stuff.

Q. Okay. And the documents that are attached, can you kind of explain the two difference -- the two difference of these two COIs?

A. Well, this -- the first one you're showing me is -- it shows, if you look on the top right, it's general liability policies and explains your -- what coverages and what companies they're with. And then it goes through the -- goes through the amounts and the dates. And then it has a certificate, you

Page 16

know, the description of everything, and then it has the cert holder.

Q. And then there's the second COI. And this --

A. Right.

Q. -- was the one that had originally come from your agency; correct?

A. Yes.

MR. HONICK: Objection.

You can answer.

THE WITNESS: Yes.

BY MS. YODER:

Q. Is this not -- is this the -- is this ACORD COI the same one that your office sent to Mr. Montgomery?

A. It was -- it was definitely altered.

Q. Okay. Do you have any idea what happened to the COI between the time it left your office and was sent to -- ultimately sent to Mr. Conaway?

A. You're gonna have to rephrase that, please.

Q. Do you have any specific knowledge as to -- you referred to alterations on the document. Do you have any specific knowledge about what those alterations are or who did them?

Page 17

A. I could see what was done, but I don't know who did them.

Q. Okay. And what was done?

A. Well, you can see where it says "any auto" is checked, that's done by hand. That's not done by the computer. And you can see "scheduled," and you really -- you can't have both. You can't have scheduled and any auto. It's either one or the other. So that was suspicious. And then you can see where it has "scheduled vehicles," then everything below scheduled vehicles looks like somebody copied and pasted something on top of the scheduled vehicles. You can tell by the line on the bottom of that little section, it's all crooked.

Q. Do you have any insight on why this document was altered?

A. I really don't.

Q. And do you have any reason to believe that anyone other than Patrick Montgomery was involved in the alteration of this document?

MR. HONICK: Objection.

You can answer, Mr. Rovner.

THE WITNESS: After looking at everything you sent me, it was sent to him

MAGNA
LEGAL SERVICES

Page 18

directly; and within less than two hours it came out like this.  So I don't know how -- how it could be anyone else but him, to be honest with you.

BY MS. YODER:

Q.    And you didn't direct him to alter this document; correct?

A.    No.

Q.    And are you aware of anyone who did directed him to do this?

A.    No.

Q.    You would agree with me that the alteration of the COI does not change the fact that there is coverage in this policy; correct?

MR. HONICK:  Objection.

You can answer, Mr. Rovner.

THE WITNESS:  No.

BY MS. YODER:

Q.    Meaning the coverage still exists, despite the alterations to this document?

MR. HONICK:  Objection.

THE WITNESS:  Yes, there was coverage, but it just changed what was covered.

Page 19

BY MS. YODER:

Q.    Okay.  But it doesn't change the fact that Progressive issued a COI for coverage -- auto coverage for Conaway?

MR. HONICK:  Objection.

You can answer.

THE WITNESS:  No.

BY MS. YODER:

Q.    Have you ever seen a COI altered like this before?

A.    No.

Q.    So you would agree with me that it's a highly unusual situation to see something like this?

A.    Yes.

Q.    And you've been working in the industry, say -- it was at least 40 years; right?

A.    A long time.  Too long.

Q.    Okay.  And in your 40 years, you've never seen something like this before; correct?

A.    I've seen insured do it -- do things, but I've never seen an agent do it.

Q.    Okay.  I have nothing further.  Thank you, Mr. Rovner.

Page 20

E X A M I N A T I O N

BY MR. HONICK:

Q.    Good morning, Mr. Rovner.  My name is Allen Honick.  I represent the Plaintiffs, the Yoders, in this matter.  I have a couple follow-up questions for you.  Okay?

A.    You represent who?

Q.    I represent the Yoders.  I know it's a little confusing because Kate Yoder.

A.    I see two Yoders here.  That's what got me confused.

Q.    We thought it was a joke when Ms. Yoder entered her appearance in this case, too.  But not related, different Yoders.

A.    Okay.

Q.    I represent the Plaintiffs, though, in this case.

A.    Okay.

Q.    Okay.  A couple follow-up questions for you.

In your time -- how long did you work or did you provide any type of coverage for the Conaway entity?

A.    I think about two -- two, two-and-a-half

Page 21

years, maybe.

Q.    Okay.  In that time, did you ever correspond directly with Builders First Source?

A.    I don't think so.

Q.    Okay.

A.    I'm not sure, but I don't think so.

Q.    All right.  When Mr. Conaway -- excuse me, when Mr. Montgomery reached out to Ms. Dougherty at your firm back in August of 2020 and asked for the ACORD certificate, did she tell -- or did he tell anybody at your outfit that BFS had rejected the Progressive dec page?

MS. YODER:  Objection.

You can answer.

THE WITNESS:  There was a -- I think there was an e-mail that said that they preferred an ACORD, not what was sent.

BY MR. ALLEN:

Q.    Okay.  And, in your experience, in all of your time doing this, is that something that you've encountered before?  In other words, where, you know, a --

A.    I can see that.

Q.    -- requested --

Page 22

A.    I can see that.

Q.    Okay.  All right.  I'll share my screen with you for one second here.  Hopefully, I don't hang myself up.

Can you see my screen, Mr. Rovner?

A.    Yes.

Q.    All right.  And this is the same document that you produced to us.  I believe it's just -- this was produced to us by Builders First Source.

This is that same altered certificate; right?

A.    I did not produce that.

Q.    Right.  But this -- all I'm saying is, this is the same one, the altered one, that we --

A.    Yes.

Q.    -- we're just looking at.  It's just --

A.    Yes.

Q.    All right.  Would you agree with me, Mr. Rovner, that this certificate in its current form is fraudulent?

A.    Yes.

MS. YODER:  Objection, outside the scope.

BY MS. HONICK:

Page 23

Q.    Was that a yes?

A.    Am I allowed to answer?

Q.    Yes.

A.    Yes.

Q.    Okay.  Now, I want to go through this document with you, just a couple parts of it.

Over here in the "Automobile Liability" section, do you see this in the middle here?

A.    Yes.

Q.    Can you explain why "scheduled autos" and "any auto" would never be checked at the same time?

A.    Well, yeah, because -- because any auto, you wouldn't have to put scheduled auto, because it's every auto.

Q.    Okay.

A.    It's kind of self-explanatory.

Q.    Got it.

A.    And scheduled auto means whatever's on the policy is covered and nothing else.

Q.    Okay.

A.    Any auto means any vehicle they own.  It's a broad giveaway of coverage.  So it would not be something that's -- it's very rarely you get any auto.  It's, like, not a common thing because

Page 24

insurance companies don't like giving insurance to vehicles that they don't really know what's -- what's going on.

Q.    Especially in commercial -- in the commercial context; right?

A.    Absolutely.

Q.    Okay.  All right.  I noticed down here in the "Certificate Holder" section, where I'm highlighting -- do you see that?

A.    Uh-huh.

Q.    Where it says -- it's kind of cut off, but it looks like it says scheduled vehicles here.

Do you see that at the bottom here?

A.    Yes.

Q.    Is this portion -- obviously, I think your testimony was this was, you know, cut and pasted onto this document; right?

A.    It's obvious.

Q.    Okay.  It's obvious.  And as far as this "scheduled vehicles" language, is this in conflict with what's checked off over here in the "Automobile Liability" section?

A.    I guess it is.  I -- I hadn't noticed that the schedule was still there.  He should have copied

Page 25

and pasted over that.  If he was doing a good job, he would have covered that up.

Q.    Okay.  Let me ask you this question, Mr. Rovner.  If you received this certificate that we're looking at and you hadn't issued it, if you just received it in its current form, would you know right away that it was fraudulent?

A.    Yes.

MS. YODER:  Objection.

BY MR. HONICK:

Q.    And how would you know that?

A.    Well, the schedule that -- and then you can just -- to me, the line, you know, and the scheduled's still there would -- in the line where the paste job was, and you can see it when he photocopied it.  And the thing saying "scheduled," this -- the print's different.  It's just not right.

Q.    Okay.  By the way, this "N" over here in the subrogation waiver column, what does that mean?

A.    Well, subrogation of waiver means you don't have to go to subrogate a claim.  It lets you -- lets you bypass that part, and you could go right to, you know, court instead of going through subrogation.



7 (Pages 22 to 25)

Page 26

Q.   Got it.
A.   And that's pretty common.  Some companies do it, some companies don't.
Q.   Okay.  Mr. Rovner, you've been in the insurance industry a long time, haven't you?
A.   Yes.
Q.   In your estimation, given your experience in the industry, would anybody with, you know, any experience in commercial auto policies be able to tell that this document that we're looking at is fraudulent?
        MS. YODER:  Objection.
        THE WITNESS:  Yes.  I would say yes.
        MR. HONICK:  Okay.  And, Madam Reporter, we're going to mark this Bates label BFS0143 as Plaintiff's Exhibit-1 for this deposition, and I'll send you a copy of it.
        I'm going to stop sharing my screen for a second.
        (At this time, a document was marked for identification as Exhibit-1.)
BY MR. HONICK:

Page 27

Q.   Mr. Rovner, when Mr. Montgomery reached out to your office in August 2020 and asked, you know, initially for proof of insurance, and then ultimately for the ACORD certificate, was there any policy change that had just been made?
A.   I think they had switched some vehicles around.
Q.   Okay.  But nothing else to your recollection?
A.   No.
Q.   Okay.  And so first you sent the -- I think, the Progressive dec page; right?
A.   Yes.
Q.   Okay.  And then when that was rejected, you then sent the valid COI without the alterations; right?
A.   Correct.
        MS. YODER:  Objection.
BY MR. HONICK:
Q.   Okay.  Prior to this COI in August of 2020, had your agency ever issued another COI with Builders -- for Conaway Racing and Trucking with Builders First Source as an additional named insured?

Page 28

A.   Not that I saw.
Q.   Okay.  After August 27th of 2020, when you supplied -- or when Ms. Dougherty supplied the valid COI to Mr. Montgomery, did your agency issue any other COIs for Conaway Racing?
        MS. YODER:  Objection.  This is outside the scope of the deposition.
BY MR. HONICK:
Q.   You can --
A.   Am I to answer?  Yes?  No?
Q.   You can answer.
A.   I think so.
Q.   Okay.  And do you have any idea what date that was?
A.   No.
        MS. YODER:  Objection.
BY MR. HONICK:
Q.   Mr. Rovner, do you remember my office reaching out to your office sometime, I think, at the beginning of this year about these COIs?
        MS. YODER:  Allen, this is clearly outside the scope.  This has nothing to do with the issuance of the COI in question.  This is about you obtaining an affidavit

Page 29

later on in the case.
        MR. HONICK:  I was just going to ask if he stands by the affidavit.  But if you want to object to that, I can -- I can move on.
        MS. YODER:  Okay.
        MR. HONICK:  Are you standing in the way of that one, Kate?
        MS. YODER:  It's outside the scope.
BY MR. HONICK:
Q.   Mr. Rovner, I'm going to come back to this document, Plaintiff's Exhibit-1, for just one more question.
        Can you see this again, Mr. Rovner?
A.   Yes.
Q.   Can anybody reasonably rely on this document as proof of anything?
        MS. YODER:  Objection, asked and answered.
        THE WITNESS:  They shouldn't, let's put it that way.
        MR. HONICK:  I have no further questions.
        Mr. Rovner, thank you very much for

MAGNA
LEGAL SERVICES

Page 30

your time today.

THE WITNESS:  Thank you.

THE COURT REPORTER:  Anybody else?

MS. GRAY:  I don't have any questions.

The COURT REPORTER:  Can I get orders?

MS. YODER:  Madam Court Reporter, I'm going to e-mail you -- I'm going to mark the exhibits I did as Exhibits 1, 2, and 3, and we'll e-mail those to you.

I'll take a regular and a mini and an E-tran please.

MR. HONICK:  Yeah, I'll take a digital mini only.

(At this time, documents were marked for identification as Exhibit Rovner-1, Rovner-2 and Rovner-3.)

(At this time, the witness was excused and the deposition was concluded at 9:34 a.m.)

Page 31

C E R T I F I C A T I O N

I, Tara L. Kenny, Professional Shorthand Reporter and Notary Public, do hereby certify that the foregoing is a true and accurate transcript of the stenographic notes taken by me in the aforementioned matter.

- - -

DATE:           .................
                TARA L. KENNY

